v. Secretary of State of Georgia. So, we're going to begin with Ms. McGowan. May it please the Court, I am Charlene McGowan on behalf of the Georgia Secretary of State. The State of Georgia has a well-established interest in making sure that candidates demonstrate support among voters before they are required to place those candidates' names on the general election ballot. However, Georgia's 5% petition requirement for U.S. Representative plainly advances this State interest, and both this Court and the U.S. Supreme Court have upheld this petition requirement multiple times in past cases. The question is, has there been any kind of change in law or change in facts that materially distinguishes those earlier precedents, right? That is correct, Your Honor, and the State's position is that no, there are no material changes in Georgia law. Georgia's petition requirement has not changed, and the evidence and the facts presented in this case also do not require a different result. So, what about the federal campaign finance law? Your Honor, the federal campaign finance issues, the contribution limits apply equally to every candidate. They don't specifically target… But they did not exist in the earlier iterations, right? That is true. In earlier times, there was no limit, right, on how much you could… It's a contribution limit, right, that we're talking about? Yes, I believe what they're saying is the burden is that there are limits on individual contributions towards candidates. And this is not a burden that the State imposes on candidates. There's a contribution limit on this kind of petitioning to get on the ballot, right? As opposed to someone who is already a qualified candidate who's campaigning for election. So, if I've already qualified to be on the ballot, there have long been contribution limits, as I understand it, for the raising of my campaign funds. But what's changed is that federal law, as I understand it, has now imposed a contribution limit to, extended that to this kind of petition drop. Is that right? I believe that is correct, Your Honor. This is a limitation… Does it matter? Is that a material difference? It does not matter, Your Honor. Why not? It's not a burden that the State imposes on candidates. And I believe that contribution limit also existed at the time of the Coffield case, which was just 10 years ago, where this Court still upheld Georgia's 5 percent petition requirement. It doesn't matter if the State imposes the burden, though, right? If it's a burden, then it doesn't matter who opposes it. I believe… Imposes it. The issue before the Court is, has the State imposed a severe burden on these candidates? Now, the Supreme Court… No, I meant these contribution limits. It doesn't matter whether the State or the federal government or whoever imposes that problem. If that renders the State's signature requirement more difficult, then that's something we consider no matter who imposed the burden that results in the State's requirements being more difficult. I'm not aware of any ballot access case where this Court has considered a limitation that the federal government puts on candidates as relevant to whether the State is imposing severe burdens. And the Supreme Court has already… That's where I started with this. I'm not aware of one either, and it's not entirely clear to me what the answer to that is. It seems to me that there could be burdens that are non-legal, that nevertheless are material in considering whether this kind of requirement can pass the Anderson test today. But you argued in your, I guess it's a yellow brief, that because this came from Congress, because this was a federally imposed requirement and not a State imposed burden, it's not relevant. And I just wanted… I was interested in knowing what's the best case for that. I've been asked the same of your opponent. It's not… It seems odd to me, too, that a federal law, that something federal law does could render an otherwise constitutional State law suddenly unconstitutional. I'm troubled by that, but I'm not entirely sure that you're right either for the reason Judge Grant just said. Well, and there's also been no finding by the Supreme Court that those federal contribution limits are unconstitutional themselves. So if you have a constitutional federal requirement combined with a constitutional State requirement, I don't know how then you come to the conclusion that the State's requirements are then suddenly unconstitutional. Turning back to this issue of… I'm not sure you've answered the question, though. What's your best argument for why the burden has to… in so far as it's a legal burden, has to be State-imposed as opposed to whether we're looking at the whole picture? I'm just not aware of any case, Your Honor, where this Court has taken into account federal contribution limits and federal burdens that are imposed on candidates, especially when they're… Okay, well, we're going to consider it for the first time. Now tell me whether we should or not. Well, first of all, there's no evidence in the case that any candidate has been prevented from meeting the petition requirements because of these contribution limits. But really what their complaint is is that it's very hard to gather signatures. It's not really a money-raising issue. Now raising money is certainly a burden that candidates do face, but all candidates face that, especially in a race for U.S. Congress that certainly does require money, gathering support, gathering volunteers, and convincing and persuading voters to support your campaign. These are all things that candidates face, and they all face the same sort of contribution and fundraising restrictions from a federal law standpoint. And the issue before the Court is looking at Georgia's petition requirements as a whole and whether as a whole they are objectively reasonable and whether they make it virtually impossible for a reasonably diligent candidate to obtain ballot access. And here there's no evidence that's sufficient to support the District Court's finding that Georgia imposes a severe burden on candidates. The Court focused primarily on the fact that no candidate has met the petition requirement for U.S. Representative, but what the evidence really shows is there's not much evidence that candidates have really tried. We don't have evidence here of reasonable diligence for the candidates that made statements and testified in affidavits in this case. What the evidence does show is that some candidates for Representative in the past have failed to meet the petition requirements because they either didn't try very hard or they weren't very popular with voters. And there's no evidence that the Libertarian Party here has made a concerted, organized effort to make sure that their candidates are able to meet the petition requirement. There's only one time where the party invested money behind a candidate. In that case it was Mr. Parker. They invested $40,000 towards his petition campaign. And he was able to collect a good amount of signatures. This is the most organized campaign the party has done. The rest of the evidence shows that there's no candidate that has used the full six months that Georgia allows candidates to collect signatures. There's no evidence that they have invested any substantial amount of money in their campaigns other than Mr. Parker. And there's no organized effort from a party standpoint. As I understand it, Mr. Parker was doing it on a truncated schedule and therefore didn't have to collect. The court ruled that he didn't have to collect quite as many signatures. The district court made it a requirement of a proportionate number based on that truncated schedule, right? Yes, that is. And Parker came how close? He came very close. He was able to collect 20,000 raw signatures, I believe. He became within 1,000 signatures close of being able to meet that reduced requirement. But only 8,000 of them were valid, and he needed 9,000. That is correct, Your Honor. He got 20,000. Is the reason why there's over a 50% invalidation rate? I just was surprised about that. And then I thought, well, maybe the reason is because everybody can sign multiple petitions. Why is it such everyone has more signatures than necessary, but ultimately it looks like at least 50% are not either eligible voters or some other problem? I believe the rejection rate ranged from some have been higher than others. Some are not as high as 50%. I believe the evidence showed that some had very small rejection rates. What's the cause of the rejection rate is what I'm trying to get at. Yes, Your Honor. Petitions have to have signatures from registered voters who reside within the district. So reasons why signatures could be invalidated is that because the person was not a registered voter or they didn't reside in the appropriate district. And what the Secretary's Office does is they look at the signature. Does it have enough number of signatures on its face? And then they give the petitions over to the counties to verify that the voters reside within the district and also are registered voters. And so if the signatures don't meet that criteria, then they are invalid signatures. And so it is the responsibility of a candidate to make sure that they are getting signatures from the right amount, from the voters that are eligible to sign the petition. And do they do signature matching or are they just checking the name to see that they're an eligible voter? I know they don't have to have voted before, but they just have to be eligible. There's no signature matching. If it's pretty clear that it's a fraudulent signature, such as every signature is in the same handwriting, then they may take that into account. But this is really an objective standard that they use when they are verifying the petitions. It just was peculiar to me. If you get $20,000 for a congressional district and then you'd have less than $9,000, we're good. And I can't speak to the exact reasons why the signatures in that case were not validated, but it is the burden of the candidate to make sure that they are collecting valid signatures from voters who do reside within the district and are eligible to sign a petition. But other than that, there's no restrictions on the voters that can sign a petition, and they may sign more than one petition. But anyway, the record doesn't tell us, is what you're telling me, the basis for why, like Mr. Parker, like you said, why he got $20,000 and why only $8,000 counted, and he missed the $9,000. We don't know why. We don't know the specific reasons for Mr. Parker. Now, the State does provide a process for judicial review, and Mr. Parker did go through that process. That is in his affidavit that he did petition the Superior Court to review that, and he was not successful in that petition. So if a candidate doesn't believe that their petition signatures have been arbitrarily invalidated or that the rejection is not valid, then that particular candidate can seek judicial review of that determination. And I will reserve the remainder of my time for my rebuttal. Yes, you've still got four minutes. You've been on our time. Mr. Sells. Thank you, Chief Judge Pryor, and good morning, almost afternoon.  I'm Brian Sells, and I represent Martin Cowan and others. We're asking the court to do three things. Affirm the district court's judgment on the plaintiff's First and Fourteenth Amendment claims. Number two, vacate the district court's judgment on the plaintiff's equal protection claim. And third, vacate the district court's remedial order. And I'll try to approach those in turn, but I invite the court's questions. I'll go ahead and ask, is it your position that the signature requirements have become more difficult to meet since the Genes case? I think they have clearly become more difficult to meet than the Genes case. Why? Since the Genes case. Well, what you have today is a signature requirement that, in absolute terms, is higher, much higher, almost twice as high as any signature requirement that any independent or third-party candidate has ever overcome in the history of the United States. I don't know how many registered voters. No, but it's a signature requirement that the Supreme Court and this Court has upheld. And the question is, what's materially different now from then? Sure. So, Judge, I think in answering that question, what is materially different, you have to ask what was material to the Supreme Court first. That's the starting point, I think. Was it the open, and I can't remember the exact phrase, the distinct openness of the signature requirement? That seemed pretty important. I think if you look at the Supreme Court's opinion, there was one fact that it mentioned more than any others, and that was the fact, it was stipulated record, that there were two candidates who had recently met the 5% requirement. They were George Wallace, who was, I don't need to tell you who George Wallace was. No, you don't. And the political circumstances of the 1968 election. He met the requirement. And the other was Beau Calloway, which is, he's a lesser-known candidate, but he was a Republican. He was not a third-party candidate. He got on the ballot as a major-party candidate because Georgia law allowed a petition requirement under those circumstances. Those, in my view, are a little bit special circumstances. However, we don't have a record of recent success in this case, certainly not at the U.S. representative level. So I think the number one — But does that matter? Yes. I think it does. I think what's material to the Supreme Court was those recent successes. We have no recent successes here. And the Supreme Court in other cases has said quite clearly that history matters. Wait. I want to back up. Didn't the parties agree that an independent candidate for Brunswick district attorney submitted a petition that passed the 5% requirement in 2020? So that was not a candidate for United States representative. Sure, but neither was George Wallace. Excuse me? Neither was George Wallace, though. Well, right, and we don't rely on George Wallace either. And what I'm saying is that no third-party candidate for U.S. representative has ever been on the ballot since the petition requirement took effect. But is it the real issue whether a reasonably diligent candidate has sought to do so and failed in a way that the facts show that the burden makes it virtually impossible? Isn't that what the legal showing has to be? I think under the Libertarian Party of Florida case, that's one way of articulating the standard. But I think we've clearly met that standard. How? Both with the duration of the absence from the ballot ever since the beginning, 1943. Well, if no one tried in the duration, if no reasonably diligent candidate tried, that would mean zero to me. Possibly, but that's not the evidence here. We've had candidates who have tried. And I would add, this is very important, the secretary's argument is that nobody tried. But that is inconsistent with their response to our statement of undisputed facts. They do not take issue with the effort that a good many of these candidates put forth. And there's no evidence to put those facts, the declarations from the candidates, into dispute. It's that record here that really distinguishes this case from Jenna's, which was essentially a facial challenge on a stipulated record. This is not. We have the evidence here showing that we meet the Libertarian Party of Florida standard. There are candidates who have tried and have failed. And we knew we had to do this. Is the Brunswick County official under a different standard? So the Brunswick County official is not. Here's how the district court treated that, and I think it approached that correctly. The Brunswick County DA's case was a bit of a special circumstance because, as you know, Ahmaud Arbery. Ahmaud Arbery was killed in between, or his case became public, in between the filing deadline and the petition deadline. And so had Keith Higgins not been able to gather those signatures, Jackie Johnson, who's now under indictment, who was alleged to have engaged in prosecutorial misconduct, would have been on the ballot without opposition. That was very well known, and it made it really easy for Keith Higgins to gather the right number of signatures. So why doesn't that show that, in some circumstances, a candidate can demonstrate a modicum of support? If there were no support for a different candidate, then perhaps they can't get the right amount of signatures. Well, I don't think that's consistent with the Libertarian Party of Florida standard. The question is not, in a special circumstance, can any candidate satisfy it? That's not the standard. The standard is, can a reasonably diligent candidate satisfy the requirement? And we have met that showing here with a particular focus on the office at issue. I guess one reason I'm bringing up, one reason I'm focusing on this Brunswick candidate so much, is that you said that the Supreme Court relied on, for instance, the George Wallace candidacy, which we've agreed was a special circumstance. So if that special circumstance candidacy, as you put it, was a sufficient example before, why would this new special circumstance candidate be any different from a comparative perspective? I think a DA is a lot different than a member of Congress. It's a much higher number of signatures that a member of Congress has to collect. There are boundary issues that come into play when you're talking about collecting signatures for a congressional district, whereas DAs are in a judicial circuit, which includes whole counties. That makes it much easier to gather signatures. And let's see. I think those would probably be my number one issues in terms of the difference between a congressional candidate and a DA. I'm concerned about the relevance of the federal campaign finance law. The state argued in its last brief that what counts are state imposed burdens, not a burden imposed by federal campaign law. When I tried to explore that with your adversary, I think the best she had was that there wasn't any case law really addressing it. I think that's probably right. But it seems awfully odd to me that Congress could pass a law and nothing changes, nothing otherwise changes with the state, and now the state burden is unconstitutional. That strikes me as that can't be right. I beg to differ, Your Honor, and let me give you a hypothetical. Congress could clearly, under its Elections Clause power, say candidates for Congress may not gather signatures except for Monday between 9 a.m. and noon. That would clearly make the signature burden in Georgia much harder. And under the Anderson test, nothing's off limits. It's almost a totality of circumstances test, even though that's not the language that the Supreme Court chose to use. It's any circumstance that makes the magnitude of the burden higher or lower. Well, it seems to me, Mr. Sells, that the question is whether the state signature requirement is unconstitutional or not. And the state signature requirement didn't change from one day to the other. It was always the same, and it wasn't the cause of any violation. So when the federal campaign finance law comes in, I mean, look, I think federal campaign finance laws make lots of elections tougher, right? It's not just petition drives, but, you know, all the contribution limits, everything else, make it more difficult. I don't know why that's relevant to whether the state law that's never changed and was previously constitutional is now suddenly unconstitutional. I would just repeat what I said, that the Anderson test is a totality of circumstances test that any piece of evidence But it doesn't say in it that we evaluate a federal law requirement, does it? Is the state right that there really isn't, that that's kind of a novel twist on this? There's really not any clear precedent about the overlay of a federal requirement? So you're absolutely right on that last point, Chief. There is no precedent on that. But when I spoke to my clients, they told me, we have a hard time raising money. And I heard Ms. McGowan say that there's no evidence in the record on that. And that may be because she's just not familiar with the record as I am. But I want to point out where the money raising is in the record so you can go look at that. There's a declaration from Cynthia McKinney who states that she'd abandoned her planned campaign as an independent or Green Party candidate because she couldn't raise the money, enough money to gather the signatures because she had to do it in small chunks. There's also testimony. This is about a little more than $5,000 per donor, is that right? It's $5,000 per donor and for the party, for the primary and for the general. So for an independent candidate or a political body candidate which doesn't have a primary, it's the $5,000 that's dedicated to the petition gathering. And Wayne Parker's estimate, it seemed to me, the only real evidence we had on this was that it would have required $100,000 to hire the number of signature gatherers to make a feasible effort to do the job. I think there's much more evidence than Mr. Parker. There's declarations from Derek Lee. Is that about the amount though? I think at a minimum $100,000, yes. So it's a matter of 20 donors or less? If you get the maximum, yes. But that also includes the Libertarian Party. So the party itself can't help to get its candidates on the ballot but for that teeny little amount. And that's where I think the campaign finance law piece of it is the most destructive. But I would also, for cost, I would also look to the declarations of Derek Lee, Don Webb, and Hugh Esko. There's more cost in there. Some of the 20 people you cite as to who have tried are like your client, Mr. Cowan. He got 642 signatures. He only worked at it a couple of weeks. So he's not really a good example of somebody reasonably trying. I'll look at their declarations. But tell me who you say are the five that you would say were the most reasonably diligent ones who really tried. You say Parker, but what are the names of the other ones? Sure, Judge. Because many of them really have very little effort. Right. And Martin Cowan is an example of a guy who was deterred. Same with Cynthia McKinney. They were deterred. I understand, but he didn't even show anything but 642 and only trying for a couple of weeks. So it doesn't really help your case. Right. So the ones I— I'm giving you a chance to tell me the five I should go look at. Here's the five. Wayne Parker, Jeff Anderson, Eugene Moon, Hien Dai Nguyen. I hope I'm pronouncing that name correctly. That's four. And let's see. Who would be my fifth? I think there's another candidate from the tenth. Well, that's a good start. I got Parker, Anderson, Moon, Nguyen. I want to look at what period of time they did, what they spent, what were their results. So Jeff Anderson and Eugene Moon were in the last decade, and they tried to get on the ballot. They knew that— I'll look at it and see what the record shows. You've got 20, so I'm trying to see who are your best ones, you think. I think those are the best, but I would encourage you to look at our statement of undisputed material facts because that's where the Secretary of State just doesn't object and doesn't provide any evidence to the contrary. Like, we might be in a different case if they had an expert who said, yeah, they didn't try very hard, or, you know, in my experience, they didn't try very hard. Do you have an expert? We did. Who was your expert? We had Richard Winger. What does he say? Mr. Winger's testimony was—he testified about several things, but he testified a lot about the fact that the burden here is higher than anyone has ever satisfied in the entire history of the United States. He's testified about other state laws and so forth, the comparative stuff. Remind me, please, how many signatures Mr. Cowen needed. All of the districts in the latter part of the last decade were between 19,000 and 25,000. I don't remember the exact number. It's based on registered voters, which changes from day to day. And the evidence is that no third party or independent candidate for U.S. representative has ever overcome more than 16,000 signature requirement in the history of the entire United States. Has the Supreme Court ever said that it's a requirement that someone overcome these levels? For instance, if we credit the state's argument that it has a very strong or compelling interest in limiting the ballot to candidates that have a modicum of support, what if it's chosen an effective level that a candidate who has a modicum of public support could reach, but one who does not have that level of support could not? So let me say—try to say three things in response to that question. Number one, the Supreme Court has said very clearly that history matters. That's in the Storer v. Brown case, 415 U.S. at 742. Mandel v. Bradley, 432 U.S. at 178. And there are a lot of examples as well. Monroe v. Socialist Workers' Party, 479 U.S. at 197. The Ginesse case is one where they relied on the history. This Court's decision in Swanson, Judge Hull, that's your opinion. The New Alliance Party v. Hand. We've got it. What's your second point? He said you had three, so what's your second point? Okay, so my second point— Yeah, I just got off the train. It happens to the best of us. Judge Grant, can you remind me of your question? That might spur my memory. We're over time, but I'll give you a quick reminder. It is, why couldn't it be that the state, having a compelling interest in allowing only candidates with a modicum of public support on the ballot, has chosen a limit that allows candidates to be on the ballot only if they have a modicum of public support? Why must someone be on the ballot in order for a restriction to be valid? Got it. So my second point is that that generic boilerplate interest, if the analysis stops there, that would uphold not only a 5%, but a 95% petition requirement. And then the last thing I would say is that you have to look at the nexus between— I don't know that 95% is modicum, but go ahead, Mr. Stelzner. Well, I think Ms. McGowan's point is that you don't ask. As long as you've got the good interest, you don't ask if there's a connection there. Right, but I'm asking what your response is. Why must it be that someone has to have reached the threshold in order to show that it's an appropriate threshold? I'm not—I don't think I say that categorically one has to have met it. I think in the totality of circumstances, in this case, we've got a mountain of evidence that the burden is severe on the one hand, and we also have good evidence that 5% is not necessary at all to satisfy that interest. We've got the 1% petition requirement that no one has ever met in Georgia. We've got the 75 signature requirement for president that no one has ever met in Georgia. And we've got special elections in Georgia that require zero signatures, only a filing fee, and it's in the record. And those ballots have not been crowded with independent or third-party candidates either. So it's not just that we have evidence of a severe burden. We have good evidence that 5% isn't necessary. So on kind of both sides of the Anderson test, the State can't pass. I think we understand your argument, Mr. Sells. Thank you very much. Ms. McGowan, do you have four minutes? Thank you, Your Honor. I first want to address Mr. Sells' point that we've conceded things in our statement of material facts. We never agreed that their candidates have exercised reasonable diligence. Where we admitted facts is pure factual statements. For example, yes, we agree that Martin Cowan collected 600 signatures when he ran for office. We agreed that he spent a couple weeks doing this. We did not admit to their assertion that these candidates have exercised reasonable diligence. And as this Court has said, those types of conclusory statements and conclusory allegations are not sufficient. Candidates have to show how they were reasonably diligent in their efforts to meet the petition requirements. Did Mr. Parker exercise reasonable diligence? Did you claim he didn't do it? I think he is the closest that they come to showing reasonable diligence. So that's a yes or no? I'm just talking about one person. Does Mr. Parker's factual numbers that you concede in your facts, do they show reasonable diligence? What is the State's position as to that one time? As to that one time, I don't think that he shows reasonable diligence that you would expect for a congressional campaign. Yes, he did the most work. He collected the most signatures. He was on a truncated schedule, but I say that he He hired 35 people, right? He did hire 35 people. And he collected 20,000 signatures. Why isn't that reasonable diligence? And it might have been that if he had collected enough ballot signatures that it might be reasonable diligence. I'm just trying to say, yeah, if he got on the ballot, it would be reasonable diligence. Of course. I'm trying to say he collected 20,000. He hired 35 people. They spent 40,000. Why is not, at least, I'm not sure that gets Mr. Sells as far as he wants, but I'm just trying to see what is reasonable diligence. So, I don't know what will happen in this case, but we know what that is. Why is that not reasonable diligence? Just identify for me why it's not. I think if they can show one candidate that exercised reasonable diligence, I know that, I don't think that's enough to get them to proving that it's reasonable diligence. And I may well agree with you, but does it show reasonable diligence in the Parker case? I don't think it shows enough reasonable diligence that you would expect for U.S. Congress. It does show some level of diligence, but for the office that they're running for, I think if you look at what… What else should he have done to be diligent? Utilized more time, hired as many staff as needed to collect the correct amount of signatures, to have enough valid signatures. I don't know enough details about Mr. Parker's campaign. They did invest $40,000, which is more money than they've spent in past campaigns. What if he had spent $2 million and hired 1,000 workers but didn't get the right number of signatures? There may be other reasons that the restriction would be appropriate, but would he have exercised reasonable diligence in that instance? Yes, in that hypothetical, yes. I would call that reasonable diligence for a congressional campaign. So somewhere between 35 people and 2,000 people is reasonable diligence? I don't know if I can drill down to exact specifics, but the issue is what can the state reasonably expect candidates to do when they're running for U.S. Congress, especially where you have party candidates who have to get a majority of votes in order to be on the general election ballot. They have to spend sometimes millions of dollars to win that primary, and it's reasonable for the state to expect that candidates for U.S. representative will put money behind their campaign, put time, put resources in order to secure that place and show that amount of support among the electorate before they have to place their names on the general election ballot. Okay. We have your case, Ms. McGowan, and we are adjourned for the week. Thank you.